793 A.2d 607

EARL L. POSEY, JR., BY HIS GUARDIAN AD LITEM, EARL L. POSEY, SR., AND EARL L. POSEY, SR., AND GALE POSEY, PLAINTIFFS–APPELLANTS, v. BORDENTOWN SEWERAGE AUTHORITY, HENRY E. MARKEN AND RUTH V. MARKEN, ABC, INC., MARTIN SACHS, ESQ., AND SACHS & SACHS, P.A., DEFENDANTS, AND TOWNSHIP OF BORDENTOWN AND COUNTY OF BURLINGTON, DEFENDANTS–RESPONDENTS.

Argued November 26, 2001—Decided March 18, 2002.

174

*Evan Edward Laine,* argued the cause for appellants, (*Gold & Laine,* attorneys).

*F. Herbert Owens, III,* argued the cause for respondent Township of Bordentown, (*Owens & Wolf,* attorneys).

*Robert A. Baxter,* argued the cause for respondent County of Burlington, (*Capehart & Scatchard,* attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

This sad case involves the near drowning and subsequent death of a twelve-year old boy. The accident occurred in a pond that is located on private property and receives water from a stream in an adjacent public park. Plaintiffs allege that the stream and pond are not natural bodies of water, but rather are part of an integrated storm-water drainage system for which the Township of Bordentown and the County of Burlington are responsible. The legal issue presented is whether either or both of the public entities may be liable for the injuries sustained on private property under the New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 12–3. The trial court found that liability could not be imposed on either public entity and granted summary judgment to the Township and to the County. The Appellate Division affirmed. We hold that a public entity may be liable for a dangerous condition on private property that is proximately caused by the public entity's activities on public property, in this case, directing storm-drainage water onto private property.

## I.

The Law Division decided this case on a motion for summary judgment brought by defendants Bordentown and Burlington County. The evidence presented, therefore, must be "viewed in the light most favorable to the non-moving party," and all reasonable inferences must be drawn in favor of that party, here the plaintiffs. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 535–36, 666 *A.*2d 146 (1995). Because summary judgment in favor of the public entities was based solely on the situs of the accident—a pond on private property—we begin our review of the evidence with a description of the area where the accident occurred.

Bossert Park is located in, and owned by, the Township of Bordentown. The park is separated from private property owned by Henry and Ruth Marken by a paved street known as Thorntown Lane. There is a stream, Thorntown Creek, that flows from the park into the Markens' property. To reach the Marken property, Thorntown Creek flows under Thorntown Lane by way of a culvert, a concrete tunnel six feet high and five feet four inches wide, that supports Thorntown Lane while allowing Thorntown Creek to pass underneath. Once past Thorntown Lane, the stream immediately exits the culvert into a pond. Water from the pond flows into another stream, also on the Marken property, and ultimately empties into the Delaware River Basin. Until the instant litigation, the Markens were unaware that either the pond or the stream was located on their property.

The pond is approximately thirty feet wide and varies in depth from four to twelve feet, depending on the amount of precipitation. The stream, on the other hand, is only two to three feet wide and six to ten inches deep. Both the stream and the pond are traditional congregating spots for children who fish in the pond, skip stones, and wade in the water on both sides of the culvert. Although children have been known to wade upstream of the culvert, the entrance to the culvert contains no physical barrier or

warning sign to indicate the change in depth of the water on the pond side of the culvert.

On March 20, 1994, twelve-year old Earl Posey, Jr. and two other boys were walking in the ankle-deep water of Thorntown Creek in Bossert Park. Unlike his companions, Earl had never been to the stream or the pond before. At some point while walking in the creek, the other boys told Earl about the pond. The boys informed him that they thought the pond was approximately four or five feet deep. When Earl reached the culvert he and the other boys agreed to walk through it. Although Earl and one of the boys had never been in the tunnel before, the other boy had been in it a few times.

When the boys exited the culvert onto the Marken property the water level began to change quickly. One of the boys later testified at a deposition that, when the water level reached his knees, "[w]e just told [Earl] don't go any further 'cause it looked like [the water] was rising pretty fast on him, and then he just dropped.'" As the other boys climbed out of the pond and onto its banks, Earl, who was approximately five feet tall, disappeared under the water about nine feet from the culvert. As Earl tried in vain to surface, the two boys ran for help. By the time rescue personnel arrived and pulled Earl from the water, he had already suffered severe brain damage. Earl remained in a comatose state until his death in May or June 2001.

Earl's parents instituted the present litigation against the Markens, the Bordentown Sewerage Authority, the Township of Bordentown and the County of Burlington. Plaintiffs settled their claims against the Markens in 1997. The Sewerage Authority was granted summary judgment because plaintiffs failed to file a timely notice of claim under the TCA. Therefore, the Township and the County are the only remaining defendants in the case.

Plaintiffs' theory of liability against the public entities is based on the assertion that the pond was unnaturally and unexpectedly deep and, as such, constituted a dangerous condition for which the Township and the County should be liable under the TCA,

*N.J.S.A.* 59:4–2. That the pond was not owned by the Township or the County is undisputed. Plaintiffs contend, however, that the pond is part of an integrated storm-water drainage system for which the Township and the County are responsible. Under plaintiffs' theory the integrated drainage system consists of the stream in the park, three storm-water drainage pipes that empty into the stream, and storm-water grates on Thorntown Lane, all of which empty into the pond on the Marken property by way of the culvert. Plaintiffs contend that the storm-water run-off into the stream is partially responsible for creating the pond on the Marken property, thereby significantly and artificially increasing the depth of the water immediately downstream from the culvert.

Plaintiffs further contend that installation of a sanitary sewer pipe by the Township, combined with scouring velocities of water coming out of the culvert, created a deep depression in the pond just downstream of the culvert. Plaintiffs' expert hypothesizes that, when the sewer pipe was installed, an excavation was dug that was backfilled with available material after the sewer pipe was placed in the ground. The expert further hypothesizes that the installation did not include erosion control techniques to prevent backfill material from being unstable and washing downstream, thus scouring or eroding the bottom of the pond. Moreover, because the culvert created a restriction on the flow of water, the water exited the culvert at a much higher velocity than that at which the stream normally flows. Thus, the expert concludes that the construction of the sewer line underneath the stream and the culvert's effect on the speed of the water combined to create a scouring effect whereby a deep depression was left on the pond side of the culvert.

Viewing the evidentiary materials in a light most favorable to the plaintiffs, the Township and the County each had a role in constructing and maintaining portions of the alleged integrated drainage system. The County first built the culvert in question in the 1920s. The County still owns the culvert and the retaining walls, and is responsible for inspecting and maintaining them. At

some point after the culvert was constructed, either the County or the Township installed storm-water pipes that feed into the stream. One storm-water pipe is approximately one hundred yards upstream of the culvert, another is ten yards upstream of the culvert, and the third pipe is in the culvert itself. The Township maintains that it does not know who installed the three storm-water drainage pipes. Although the trial court stated that the Township is responsible for the storm-water drainage system, the court's subsequent written opinion indicated that the County installed the three pipes. The court noted that in 1940 and in 1958,

> the County widened the culvert and added surface water drains and pipes to carry surface waters from Thorntown Lane and the surrounding area into the stream that leads into and through the culvert. However, it is also clear that once built and modified, except for infrequent inspections of the culvert itself and the drains, the County has for all practical purposes ceded the day-to-day control of the maintenance and functioning of the surface water drainage system including the culvert to the Township.

The Township, however, points to the County as being responsible for the storm-water pipe that is inside the culvert.

In addition to installing the storm-water pipes, either the Township or the County installed storm-water grates on Thorntown Lane to drain rain water and melting snow into the culvert. The County contends that the Township is responsible for storm-water run-off from Thorntown Lane because Thorntown Lane is a Township road. As noted above, however, the trial court indicated that the County had installed the storm grates. Therefore, although it is clear that water empties into the pond, at least by way of the grates on Thorntown Lane, triable issues of material fact exist concerning which of the two defendants installed the storm-water drainage pipes, whether an integrated drainage system exists, and whether it is maintained by the Township or the County.

As far as the sanitary sewer pipe is concerned, the trial court concluded during the summary judgment proceedings that the Township installed it. The trial court described the installation of the sanitary sewer pipe as follows:

At some unknown time, but inferentially when houses were being built on the lands surrounding the downstream end of the stream, an easement was secured from the Markens or a predecessor in title whereby the Township acquired the right to install and maintain a sewer pipe running beneath the Marken property, essentially perpendicular to the stream. This easement cuts across the stream at about the location of the deeper ponding water as it exits the culvert and the pipe was laid under the bed of the pond and the stream. Sewage is carried eventually to the treatment plant. In 1986 this easement and the pipe was [sic] conveyed to the Bordentown Township Sewer Authority which now has jurisdiction over sewer facilities within the Township.

Although the Sewer Authority was granted summary judgment and is no longer a party, plaintiffs contend that the Township is responsible for the installation of that sewer pipe and the alleged improper backfilling.

The Township, on the other hand, contends that the stream and pond are natural bodies of water that are not part of an integrated storm-water drainage system. The Township therefore argues that the depth of the water in the Marken pond resulted from natural causes. On the day in question, the temperature was approximately fifty degrees Fahrenheit and there recently had been a heavy snowfall. The Township therefore argues that the depth of the pond that day was due to melting snow.

The trial court initially denied the Township's motion for summary judgment based on disputed material facts. On the legal issue presented, it recognized that a public entity could be liable for "a dangerous condition of public property which causes injury on private property" under *Saldana v. DiMedio,* 275 *N.J.Super.* 488, 495, 646 *A.*2d 522 (App.Div.1994). That case denied immunity where a fire spread from public property and caused damage to adjacent private property. On rehearing, however, the trial court "retreated from the idea that a dangerous condition of private property could render public property also dangerous." Apparently believing that summary judgment was premature at that point, the trial court allowed discovery to continue based on the theory that the Township "contributed to the creation of the pond ... by permitting water to discharge into a stream in greater than natural quantity; that it improperly constructed the area of the

easement [the sewer pipe]; and that it maintains the stream and its banks on both sides of the culvert."

After completion of discovery, the trial court granted summary judgment to both the Township and the County. The court felt constrained by an interim decision issued by the Appellate Division, *Roe ex rel. M.J. v. New Jersey Transit Rail Operations, Inc.*, 317 *N.J.Super.* 72, 721 *A.*2d 302 (App.Div.1998), *certif. denied,* 160 *N.J.* 89, 733 *A.*2d 494 (1999), that addressed the issue whether a public entity can be liable for injuries sustained on private property. Although *Roe* denied immunity to the public entity, the trial court here held that the present case is distinguishable from *Roe* and more akin to *Levin v. County of Salem,* 133 *N.J.* 35, 626 *A.*2d 1091 (1993), in which this Court granted immunity. The trial court therefore granted summary judgment to the Township and to the County, holding that as a matter of law a public entity cannot be liable for a dangerous condition on private property.

The Appellate Division affirmed in an unpublished opinion. The appellate court found that liability in *Roe* for injuries occurring on private property was nonetheless predicated on the fact that the dangerous condition that led to the injuries was on public property. The court therefore concluded: "We are satisfied that *Roe* provides no authority to warrant imposing liability upon public entities for a dangerous condition of private property. The trial court was entirely correct in its grant of summary judgment." We granted certification, 168 *N.J.* 293, 773 *A.*2d 1156 (2001), and now reverse.

II.

The determination whether the Township of Bordentown and or the County of Burlington may be liable to plaintiffs for injuries sustained on private property must be decided based on application of the TCA. The TCA provides that "a public entity is not liable for an injury" caused by an act or omission "[e]xcept as otherwise provided by this act." *N.J.S.A.* 59:2–1a. Under the TCA, immunity is the rule and liability is the exception. *Ibid.;*

*Wymbs ex rel. Wymbs v. Township of Wayne*, 163 *N.J.* 523, 531, 750 *A.*2d 751 (2000); *Fluehr v. City of Cape May*, 159 *N.J.* 532, 539, 732 *A.*2d 1035 (1999); *Garrison v. Township of Middletown*, 154 *N.J.* 282, 286, 712 *A.*2d 1101 (1998). The TCA defines public entities to include counties and municipalities. *N.J.S.A.* 59:1–3. The Township and the County as defendants therefore fall within the coverage of the TCA.

The exception to the general rule of immunity relevant to this case is found in *N.J.S.A.* 59:4–2, which covers dangerous conditions on public property. That statute provides:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. a public entity had actual or constructive notice of the dangerous condition under section 59:4–3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
>
> [*N.J.S.A.* 59:4–2.]

The TCA defines "public property" as property that is "owned or controlled by the public entity." *N.J.S.A.* 59:4–1c. A " '[d]angerous condition' means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4–1a.

In this case, plaintiffs claim that defendants constructed an integrated storm-water drainage system that created a dangerous condition in the pond that caused Earl's injuries. It is undisputed that the pond was not on property owned by either the Township or the County. Under plaintiffs' theory then, defendants may be liable for harm caused on the private property only if they "controlled" the portion of the pond where the accident occurred.

*N.J.S.A.* 59:4–1c; *Christmas v. City of Newark,* 216 *N.J.Super.* 393, 397, 523 *A.*2d 1094 (App.Div.), *certif. denied,* 108 *N.J.* 193, 528 *A.*2d 19 (1987). To satisfy that requirement, plaintiffs therefore contend that the Township and the County controlled at least that part of the pond where the accident occurred because they made it part and parcel of an integrated storm-water drainage system for which the Township and the County are responsible.

### A.

█ Next, we address the TCA's meaning of "control," an issue that this Court has never before considered. The Appellate Division, however, previously has held that regulatory control is insufficient to establish control within the meaning of *N.J.S.A.* 59:4–1c. *Garry v. Payne,* 224 *N.J.Super.* 729, 735, 541 *A.*2d 293 (App.Div.1988) (involving state—and city-regulated boarding house); *Kenney v. Scientific, Inc.,* 204 *N.J.Super.* 228, 238–39, 497 *A.*2d 1310 (Law Div.1985) (involving state-regulated landfill); *Danow v. Penn Cent. Transp. Co.,* 153 *N.J.Super.* 597, 603, 380 *A.*2d 1137 (Law Div.1977) (involving state-regulated railroad grade crossings). In this case, plaintiffs do not allege that either the Township or the County is responsible for regulating or inspecting the pond. Rather, those entities are alleged to be directly responsible for draining storm water onto private property and then failing to warn or protect against the danger that they created. *Cf. Danow, supra,* 153 *N.J.Super.* at 602, 380 *A.*2d 1137 (immunizing state entity from liability for death of motorist at railroad crossing because it merely "enforces grade crossing safety regulations through orders to compel compliance, not through action on its own to remedy or warn against dangerous conditions") (citation omitted). Here, plaintiffs do not seek to impose liability based on any regulatory functions of either public entity.

In the same line of cases holding that regulatory control is insufficient, courts simultaneously have concluded that possessory control consistent with property law is necessary. *Danow, supra,* 153 *N.J.Super.* at 603, 380 *A.*2d 1137 (stating that "[t]he word

'controlled' in *N.J.S.A.* 59:4–1(c) should not be construed as extending beyond possessory control."); *accord Kenney, supra,* 204 *N.J.Super.* at 239, 497 *A.*2d 1310 (stating that "[t]he logic of *Danow* is buttressed by the fact that to extend *N.J.S.A.* 59:4–2 to property not in the possessory control of the State would be to expose the State to enormous liability."). The County, relying on that conclusion, asserts that it cannot be liable for injuries incurred in the pond because it did not have possessory control of the pond. We disagree.

Possession, as Holmes explained, "means more than its most literal connotations, else 'one could only possess what was under his hand.'" *State v. Schmidt,* 110 *N.J.* 258, 267, 540 *A.*2d 1256 (1988) (quoting Holmes, *The Common Law* 236 (1881)). Consistent with Holmes' view, our law now recognizes, in addition to actual or possession in fact, there is constructive possession, which is possession implied in fact. *Id.* at 268, 540 A.2d 1256. Constructive possession is based on an individual's or an entity's "conduct with regard to the item in question." *Ibid.* At the present time, "there is a considerable degree of latitude within which courts may ... expand the legal fiction of constructive possession in order to achieve the ends of justice." *Id.* at 269–70, 540 A.2d 1256. Based on that modern trend, we hold that possessory control is satisfied where a public entity treats private property as its own by using it for public purposes. Constructive or joint-constructive possession is sufficient to satisfy the requirements of *N.J.S.A.* 59:4–1c and *N.J.S.A.* 59:4–2. Here, the public entities treated the pond as if they owned it by using it for storm-water drainage and by maintaining at least some of the adjacent land, thus making it an integral part of the property of the public entities. What is alleged to have occurred here is similar to a taking of a downstream owner's property to achieve a public purpose.

Supportive of possessory control by the public entities is the uncontroverted fact that there are storm-water grates on Thorntown Lane that empty into the stream. The record indicates that

there also are storm-water drainage pipes that carry additional storm-water run-off into the stream. The expert's opinion states that "during periods of heavy water flow" the scouring effect responsible for creating the depression worsened. Naturally, adding excess storm water to a system would create a period of heavy water flow. Therefore, viewing the facts in a light most favorable to the plaintiffs, and drawing all reasonable inferences therefrom, we conclude that the alleged integrated storm-water drainage system reasonably could be found to exist. The purpose of the storm-water drainage system was to remove excess water from public property, and this allegedly was achieved by directing the water onto private property. It reasonably may be inferred, for purposes of defending against a summary judgment motion, that the excess water from the drainage system either created or substantially contributed to an unexpectedly deep and sudden drop-off that otherwise would not have existed.

■ Our conclusion is consistent with prior decisions stating that a public entity may be liable for creating a nuisance under the TCA, *N.J.S.A.* 59:4-2. In an action for nuisance, a public entity may be liable for creating a hazardous condition on the property of another. *See, e.g., Russo Farms, Inc. v. Vineland Bd. of Educ.,* 144 *N.J.* 84, 97–105, 675 *A.*2d 1077 (1996) (holding that TCA permits nuisance and negligence causes of action for damages caused on private property by dangerous condition on public entity's property created by school drainage and municipal storm-water drainage system); *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes,* 90 *N.J.* 582, 591–96, 449 *A.*2d 472 (1982) (allowing action for nuisance for damage to lake caused by discharge from municipally owned and operated sewage treatment plant); *Saldana v. DiMedio, supra,* 275 *N.J.Super.* at 499, 646 *A.*2d 522 (allowing cause of action against municipality for dangerous condition on its property for fire that spread from city-owned abandoned building to privately-owned property); *Black v. Borough of Atlantic Highlands,* 263 *N.J.Super.* 445, 453, 623 *A.*2d 257 (App.Div.1993) (allowing nuisance cause of action for failing to

prune crab apple trees creating dangerous condition on adjacent private property). The fact that the plaintiff in a typical nuisance case is the private property owner rather than an injured third-party does not preclude a comparison to the present case. As with nuisance actions, the dangerous condition in this case—an unexpectedly and unnaturally deep drop-off into a pond—is *prima facie* actionable because it is a direct effect of the alleged integrated public-drainage system that originates on public property and terminates on private property. That is precisely what occurred in *Russô*.

Indeed, *Russo* relied on the Appellate Division nuisance case of *Sheppard v. Township of Frankford*, 261 *N.J.Super.* 5, 617 *A.*2d 666 (App.Div.1992), that involved a public entity's disposal of storm-water run-off onto private property. In *Sheppard*, the Appellate Division affirmed a jury's finding that the defendant township's storm-water drainage system created a continuing nuisance on the plaintiff's private property. The court found that the storm-water drainage system at issue "enhanced, concentrated, and sped up the flow of the storm water into the drainage ditch," thereby causing flood damage on the plaintiff's property. *Id.* at 8, 617 A.2d 666. Similarly, in the present case, giving plaintiffs the benefit of all reasonable inferences that may be drawn from the evidence, a jury may conclude that defendants unreasonably enhanced, accelerated, and concentrated storm-water discharge into the pond, thereby causing a dangerous condition.

Although the Markens may have had a cause of action for nuisance against defendants, it turns out that the Markens were not aware that they owned the pond until the instant litigation. At deposition, Ruth Marken testified that she was surprised to find that the stream ran through their property. In fact, at some point at least ten years prior to this incident, the Markens installed a chain link fence on their property that surrounds their yard and separates it from the pond. Ruth Marken testified that the stream was there when they moved in and she remained adamant in her belief that it was not on their property. Addition-

ally, a Township police officer who had grown up in the area testified at deposition that he had always assumed that the pond was the property of the Township because it was in an open area where people congregated. Although those observations are not dispositive of the legal issues before us, they offer additional support for our conclusion that the Township and the County used the Marken property as their own and controlled the area where the accident occurred.

We do not conclude that plaintiffs have established a *prima facie* case merely because, as some of the testimony by Ruth Marken indicates, the Township maintained the area of the pond on the Marken property by mowing the grass, collecting garbage and placing stones on the banks. But those are factors also indicative of control by the public entities. Nor is this claim actionable merely because the pond is attached or adjacent to an alleged integrated storm-water drainage system on public property. A jury reasonably could conclude that defendants' storm-water run-off was directed into the pond, thereby allegedly creating a dangerous condition on the private property. Summary judgment here was inappropriate in light of the totality of the "documentary-evidential materials." *Brill, supra,* 142 *N.J.* at 536, 666 *A.*2d 146.

▮ We caution that our holding should not be understood to extend unreasonably the concept of control by the Township and the County. Unlike most public storm-water drainage systems that empty into streams across the State, the facts of this case are unique. We restrict our holding to those unique facts that indicate that the point of the drop-off in the pond where the injury occurred was within approximately ten feet of the culvert and that plaintiffs' expert's report indicates that the drop-off was a direct effect of two factors: 1) the alleged unstable backfill material used after the installation of a sanitary sewer pipe under the pond, and 2) the storm-water drainage system. After allegedly integrating the storm-water drainage system with the culvert and the pond, the public entities failed to warn or otherwise protect against the

unnatural hazard that they created on the private property. Based on the record, plaintiffs have presented a *prima facie* case, supported by both a sufficient legal theory and evidentiary materials to defeat a motion for summary judgment. "Only when the evidence is utterly one-sided may a judge decide that a party should prevail as a matter of law." *Gilhooley v. County of Union,* 164 *N.J.* 533, 545, 753 *A.*2d 1137 (2000); *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146.

### B.

Having concluded that public entities may be liable for creating a dangerous condition on private property that is under the "control" of the public entities, we do not mean to suggest that plaintiffs are entitled to judgment. We hold only that summary judgment was inappropriate. Whether a dangerous condition exists is ultimately a question for the jury. In order for plaintiffs to be successful at trial, they must not only prove there was an integrated storm-water drainage system that created a dangerous condition in the pond, but "that the condition created a foreseeable risk of the kind of injury that occurred, ... that the condition proximately caused the injury ... [and that] 'the action the entit[ies] took to protect against the [dangerous] condition or the failure to take such action was ... palpably unreasonable.'" *Garrison, supra,* 154 *N.J.* at 286, 712 *A.*2d 1101 (quoting *N.J.S.A.* 59:4–2). The term "palpably unreasonable" connotes "behavior that is patently unacceptable under any given circumstance." *Kolitch v. Lindedahl,* 100 *N.J.* 485, 493, 497 *A.*2d 183 (1985). A dangerous condition under the TCA relates to the physical condition of the property itself and not to activities on the property. *Levin, supra,* 133 *N.J.* at 44, 626 *A.*2d 1091. Here, plaintiffs allege that it was palpably unreasonable not to warn of the depth of the pond or to install a protective barrier to prevent children from entering the culvert.

Defendants contend that based on *Levin* there is no dangerous condition as a matter of law. In *Levin,* the plaintiff was paralyzed

when he dove off a county bridge and struck his head on a submerged sandbar. *Id.* at 38, 626 A.2d 1091. The county knew that local residents used the bridge as a diving platform and previously had been sued for a similar accident. *Id.* at 39, 626 A.2d 1091. The county failed, however, to take preliminary measures that had been recommended as part of the prior lawsuit, such as constructing a screen or a fence to prevent people from jumping off the bridge, posting effective warning signs, or monitoring the site. *Ibid.*

The broad question before the Court in *Levin* was "whether the unauthorized use of public property for private recreational activities" constituted a dangerous condition under the TCA. *Id.* at 37, 626 A.2d 1091. In finding that it did not, the Court examined the "culpable cause of the accident" in light of the record. *Id.* at 43, 626 A.2d 1091. The Court concluded: "In this case, there was no missing plate, no broken bolt, no defect on the bridge itself that caused or contributed to the tragic accident." *Id.* at 49, 626 A.2d 1091. Here, the alleged defect was the artificially-created deep drop-off in the pond itself that caused Earl Posey, Jr. to nearly drown. Under the facts of this case children were known to, and frequently did, play in the park, and it is undisputed that those children could easily gain access to the pond by means of the culvert simply by walking through it. Genuine issues of material fact are presented for a jury's determination because reasonable minds may differ over whether the change in terrain combined with other related factors constituted a dangerous condition that caused Earl Posey, Jr.'s injuries and whether such injuries were reasonably foreseeable.

Alternatively, defendants contend that the recent Appellate Division decision in *Roe* suggests that the culvert itself must be a dangerous condition in order to impose liability on them. The court in *Roe* held that a permanently bolted-open gate on New Jersey Transit's property constituted a dangerous condition under *N.J.S.A.* 59:4-2 because it invited the public to enter a high-crime area. *Roe, supra,* 317 *N.J.Super.* at 80, 721 A.2d 302. The plaintiff in *Roe* was assaulted and raped in a dangerous area of

private property located adjacent to the public property. *Id.* at 74, 721 *A.*2d 302. A fence on the public property separated it from the adjacent area, but the gate opening through the fence leading directly to the area had been bolted open permanently. *Id.* at 75, 721 *A.*2d 302. The defendant public entity bolted the gate open to keep it from being damaged and knew that the gate was used as a shortcut to the adjacent property. *Ibid.* The court concluded that, under the TCA, a public entity may be liable where the injuries occurred off public property. *Id.* at 78–79, 721 *A.*2d 302. The court denied summary judgment on the ground that a jury could find that the bolted-open gate, which was itself on public property, constituted a dangerous condition. *Id.* at 82, 721 *A.*2d 302. Defendants contend that the culvert, unlike the gate, was not an invitation for children to walk through to the pond.

As a threshold matter, we note that *Roe* is not apposite to the case before us because the plaintiff in *Roe* did not allege that her injuries were caused by a dangerous condition on private property. As a result, the court in *Roe* had no occasion to address the issue presented in this appeal, that is, whether the public entity controlled the site on which the assault occurred as required by the TCA. In any event, our decision today is not in conflict with *Roe.* Although *Roe* recognized that a public entity may be responsible for inviting people into a dangerous area, the issue before us turns to whether public entities may be liable for creating a dangerous condition on private property. *Roe* is not controlling because the theory of liability asserted here is different from that in *Roe.* Plaintiffs' theory of liability is that the dangerous condition in the pond that injured Earl Posey, Jr. was created by defendants through their integrated storm-water drainage system. Therefore, plaintiffs do not seek to predicate liability based on the culvert constituting an invitation to danger as was the case in *Roe.*

### C.

"Although summary judgment should not have been granted in this case, we deem it appropriate to emphasize that plaintiffs still

bear the heavy burden of establishing defendants' liability under the stringent provisions of the Tort Claims Act." *Saldana, supra,* 275 *N.J.Super.* at 506, 646 *A.*2d 522. There remain genuine issues of material fact, among them, whether there was, indeed, an integrated storm-water drainage system that created a drop-off into an artificially deepened pond. The record is silent concerning how much of the water in the pond comes from the stream, the storm-water drainage system or melting snow. Plaintiffs' expert's report raises genuine issues of material fact concerning whether the storm water caused or contributed to the sudden drop-off in the pond by exacerbating the scouring effect. The expert's report presented by plaintiffs in opposition to the motion for summary judgment has been indulgently treated. Even so, it is barely sufficient.

To recapitulate, we find that plaintiffs have succeeded in raising genuine issues of material fact. *R.* 4:46–2b; *Brill, supra,* 142 *N.J.* at 523, 666 *A.*2d 146. Because of the storm grates on Thorntown Lane that empty into Thorntown Creek, the storm pipes upstream and inside of the culvert, and the culvert itself that may have affected the velocity at which water flowed from the stream into the pond, a jury reasonably could find that an integrated drainage system did exist and that it created an unnatural and dangerous condition at the exit of the culvert on private property. A jury also could reasonably find that the Township and the County knew or should have known that children play in and around the stream, culvert and pond, and that it was reasonably foreseeable that those children may walk through the culvert given the shallow depth of the water and the height of the culvert. Finally, a jury could conclude that it was palpably unreasonable for the Township and or the County not to warn or otherwise protect against the dangerously deep pond of which they had actual notice.

## III.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ, and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.