**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-1832-18T1
                        A-1835-18T1

SANDRA SMITH,
individually and as
Executrix of the Estate
of her late husband,
George Bradley Smith,

     Plaintiff-Appellant,

v.

CITY OF NORTH
WILDWOOD, STATE OF
NEW JERSEY, JOSEPH
ANTHONY "TONY"
CAVALIER, Chief of the
North Wildwood Beach Patrol,
and DAVID LINDSAY,
Lieutenant of the North
Wildwood Police Department,

     Defendants-Respondents.
_____

BRANDY SMITH, By her
Guardian Ad Litem, Sandra
Smith,

     Plaintiff-Appellant,

v.

CITY OF NORTH
WILDWOOD, STATE OF
NEW JERSEY, JOSEPH
ANTHONY "TONY"
CAVALIER, and DAVID
LINDSAY,

     Defendants-Respondents.
_____

Argued November 18, 2020 – Decided January 08, 2021

Before Judges Whipple, Rose and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket Nos. L-0324-16 and L-0331-16.

Paul R. D'Amato argued the cause for appellant Sandra Smith (D'Amato Law Firm, attorneys; Paul R. D'Amato, on the briefs).

Oliver T. Barry argued the cause for appellant Brandy Smith (Barry, Corrado, Grassi & Gillin-Schwartz, PC, attorneys; Oliver T. Barry, on the brief).

A. Michael Barker argued the cause for respondents City of North Wildwood, Joseph Anthony Cavalier and David Lindsay (Barker, Gelfand, James & Sarvas, PC, attorneys; A. Michael Barker, on the brief).

Robert J. McGuire, Deputy Attorney General argued the cause for respondent State of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel and on the brief;

Bryan Edward Lucas, Deputy Attorney General, on the brief).

PER CURIAM

In these consolidated Title 59 matters, plaintiff Sandra Smith, individually and as executrix of the estate of her late husband, George Bradley Smith (decedent), and Brandy Smith, by her Guardian Ad Litem Sandra Smith, appeal the December 18, 2018, Law Division order granting summary judgment to defendants City of North Wildwood (the City), State of New Jersey, Joseph Anthony "Tony" Cavalier, Chief of the North Wildwood Beach Patrol, and David Lindsay, Lieutenant of the North Wildwood Police Department. We affirm.

I.

This case arises out of tragic facts, which are substantially undisputed. We consider those facts, and all reasonable inferences therefrom, in a light most favorable to plaintiff as the responding party in defendants' motions for summary judgment. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). On July 26, 2012, at approximately 3:00 p.m., decedent and his daughter Brandy, along with Scott Sunderland and his children, Abby and Aiden, were vacationing in North Wildwood and decided to go to the beach. Later that day around 5:00 p.m., they walked northbound on

3

the beach through the edge of the surf in ankle-to-knee-deep water. Essentially, they reversed direction after reaching a rock wall and walked back to their original destination on the beach.

While the group walked along the beach adjacent to the Hereford Inlet, the sand collapsed under them, they lost their balance, walked into a gully, and fell into deep water. Sunderland testified as they walked in calf-deep water, he took a step with his left leg and "it just dropped;" and "I was walking and then it's just like I just stepped right into, like, nothing. It was like it almost slid, like it slipped, and then with that I just went over. So[,] it was like my leg just went out from underneath me."

After falling into the water, Sunderland swam toward the shore while Abby was holding onto his back. They made it back to shore but noticed decedent and Brandy were both at least "a hundred, 120 feet" from the beach. Sunderland flagged down two individuals on jet skis for assistance, and they were able to rescue Brandy from the water. Decedent was out-of-sight, and by 5:36 p.m., emergency personnel were dispatched to search for him. His body was recovered three days later on July 30, 2012.

Sunderland told North Wildwood police investigator Lou DeJoseph that he and Abby fell into the water along with decedent and Brandy. At his

A-1832-18T1

deposition, Sunderland testified that the group "just started walking towards the ocean," and as they "continued walking," decedent and Brandy "fell into the ocean. It dropped down." Brandy testified at her deposition that as she was walking with her father, she fell into the water and "ended up somewhere in the ocean" where she could not feel the bottom. Sunderland clarified that decedent, Brandy, and the others were walking behind him, and he did not witness how they ended up in the water.

On August 10, 2012, plaintiff initiated an investigation as to the cause of decedent's drowning and death. On July 23, 2014, plaintiff filed a wrongful death action against defendants on behalf of decedent and a personal injury action as Guardian Ad Litem on behalf of her daughter Brandy in the Law Division. Plaintiff averred that defendants were aware of the danger and negligently supervised the condition. In both actions, plaintiff asserted negligence claims against defendants claiming that a human-made control structure—a seawall 400 to 600 feet from where the drowning and accident occurred—created the substantial slope at issue and changed the character of the property from unimproved to improved property. The seawall is separated by dunes and a length of sandy beach.

5

It is undisputed that the location of the water where the accident occurred is owned by the State, and the beach is owned by the City. There is 400 to 600 feet of dry sand between the site of the accident and the Hereford Inlet seawall, and the area where the incident occurred is unprotected beach.

Plaintiff's coastal engineering expert, Richard Weggel, Ph.D., P.E., issued three expert reports about the conditions at Hereford Inlet and the causes for decedent's drowning. Dr. Weggel's reports contained no findings that the human-made inlet contributed to decedent's drowning. However, the State's expert report authored by coastal geologist Stewart Farrell, Ph.D. stated:

> Within a reasonable degree of coastal engineering probability, the water and sand conditions that contributed to the incident in this case were completely natural and unaffected by any improvements in the area. Neither the seawall nor any beach replenishments nor any other improvement played a role. The seawall does at times create a whirlpool or vortex in the immediate vicinity of the seawall. The seawall has no effect in the area where [Sunderland] says he and [decedent] went into the water.

In an addendum report submitted by plaintiff, Dr. Weggel did not dispute Dr. Farrell's findings but commented on the dangerous natural condition of the Hereford Inlet and recommended that the nearby beach be closed to visitors.

The City filed its summary judgment motion at the end of discovery, arguing it was immune from liability pursuant to the unimproved public property

6

immunity from liability provision of the Tort Claims Act, N.J.S.A. 59:4-8 and 4-9, and was otherwise immune because plaintiff could not establish the subject beach and submerged tidelands were unimproved properties. Plaintiff opposed the motion,[1] countered that discovery was incomplete, and filed a cross-motion for leave to file and serve an amended complaint to add two additional defendants, Cavalier and Lindsay. In her proposed amended complaint, plaintiff alleged: (1) the City was liable for failing to protect against a dangerous condition of property; (2) liability against Cavalier and Lindsay based on negligent supervision; and (3) vicarious liability against the City for negligent supervision of Cavalier and Lindsay. On October 26, 2016, a motion to consolidate the two matters was granted by the judge.

While the City's motion for summary judgment and plaintiff's cross-motion to amend the complaint were pending, plaintiff supplemented her discovery responses to include an expert report authored by Thomas Griffiths, Ph.D., an aquatic safety expert.[2] In his report, Griffiths opined that the

---

[1] Plaintiff filed an objection to defendants' motion for summary judgment on behalf of Brandy at a later date.

[2] Pursuant to the July 22, 2016 case management order, "[a]ll [p]laintiff's expert reports including liability and damage reports shall be supplied to defense counsel by September 30, 2016."

conditions at Hereford Inlet were caused naturally and were not the result of human-made improvements. The City objected to Griffiths's report as untimely and substantially deficient. In response, the judge extended the deadline on liability-related discovery several times until May 6, 2017. The parties agreed to again extend the discovery end date to allow time for Brandy to undergo a psychiatric medical examination. On March 23, 2017, plaintiff served a psychiatric report on behalf of Brandy.

On March 22, 2017, plaintiff named another expert, Orrin H. Pilkey, Ph.D., also a geological expert, and served his March 17, 2017 report in further opposition to the City's motion for summary judgment. On March 31, 2017, the State filed a motion for summary judgment arguing it was immune from liability for any injury allegedly caused by a condition of unimproved public property pursuant to the Torts Claims Act, N.J.S.A. 59:4-6.

The City moved to bar Dr. Pilkey's report. The judge denied the motion and again extended the discovery end date to April 17, 2018. On February 14, 2018, defendants served liability expert reports from coastal geologist, Reinhard Flick, coastal engineer Walter Crampton, and an aquatic safety consultant, Shawn DeRosa.

On July 5, 2018, the City filed its second motion for summary judgment.[3] Cavalier and Lindsay also moved for summary judgment. On December 18, 2018, after hearing oral argument, the judge granted all defendants' motions for summary judgment. In a comprehensive oral opinion, the judge concluded that N.J.S.A. 59:4-8 provides that neither a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property.

Addressing the Tort Claims Act as the governing law, the judge found that even if the unstable slope existed at the time of the event, there was no credible evidence to show it was created by anything other than the natural force of the waves, the current, and the tides. Applying N.J.S.A. 59:4-8, the judge determined that neither a public entity nor a public employee is liable for an injury caused by a condition of any unimproved property. Giving plaintiff the benefit of every factual inference, the judge also determined that nothing in the record established the seawall contributed to the tragedy.

Further, the judge found that plaintiff's only legal expert on the issue of human "improvement" to the location of the event, or alteration of that location from its natural state, rendered an inadmissible net opinion. The judge found

---

[3] It is unclear from the record whether the judge ever ruled on the initial summary judgment motions filed by the City and the State.

Dr. Pilkey relied on a December 2012 survey, which was prepared after Superstorm Sandy hit the City on October 29, 2012, thereby failing to provide an accurate account of the tidelands on the day of the event.  In addition, the judge ruled Brandy's injuries did not satisfy the "permanent and substantial" requirement under the Torts Claims Act, warranting dismissal.  The judge entered a memorializing order that day granting summary judgment as to all defendants.  This appeal followed.

On appeal, plaintiff argues: (1) the judge erred by holding that the hazard at issue was a condition of unimproved property; (2) the judge erred by holding that the City exercised no supervision over the subject hazard; and (3) the judge erred by finding Brandy did not suffer a permanent injury that vaulted the Tort Claims Act threshold.

II.

We review summary judgment using the same standard that governs the trial court.  Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012).  Thus, we consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J.

436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)).

As our Supreme Court regularly reiterates in Title 59 matters, "[t]he Act's 'guiding principle' is 'that immunity from tort liability is the general rule and liability is the exception.'" O'Donnell v. N.J. Tpk. Auth., 236 N.J. 335, 345 (2019) (quoting Coyne v. DOT, 182 N.J. 481, 488 (2005)). N.J.S.A. 59:4-8 and 59:4-9, referred to jointly as "the unimproved public property immunity" statutes, address dangerous conditions of public property. N.J.S.A. 59:4-8 provides that, "[n]either a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river or beach." A corresponding provision provides that "[n]either a public entity nor a public employee is liable for any injury caused by a condition of the unimproved and unoccupied portions of the tidelands and submerged lands, and the beds of navigable rivers, streams, lakes, bays, estuaries, inlets and straits owned by the State." N.J.S.A. 59:4-9.

Our Supreme Court has explained that unimproved public property immunity is "absolute" regardless of whether a particular condition on that property is dangerous. Troth v. State, 117 N.J. 258, 266-67 (1989). Citing

11

Troth, the motion judge explained that the area of submerged lands here was not subject to any "substantial physical modification."

> [N.J.S.A.] 59:4-8 and 59:4-9 reflect the policy determination that it is desirable to permit the members of the public to use public property in its natural condition and that the burdens and expenses of putting such property in safe condition as well as the expense of defending claims for injuries would probably cause many public entities to close such areas to public use. In view of the limited funds available for the acquisition and improvement of property for recreational purposes, it is not unreasonable to expect persons who voluntarily use unimproved public property to assume the risk of injuries arising therefrom as part of the price to be paid [f]or benefits received. A similar statutory approach was taken by the California Legislature.
>
> . . . .
>
> The exposure to hazard and risk involved is readily apparent when considering all the recreational and conservation uses made by the public generally of the foregoing acreages, both land and water oriented. Thus in [N.J.S.A.] 59:4-8 and 59:4-9 a public entity is provided an absolute immunity irrespective of whether a particular condition is a dangerous one.
>
> [Ibid. (quoting cmt. on N.J.S.A. 59:4-9).]

In Troth, the plaintiff's boat went over a spillway at a dam and caused damage. Our Supreme Court held that the Union Lake Dam itself had undergone a substantial amount of improvement to overcome the immunity because the

plaintiff actually went over the dam's spillway.  Id. at 271-72.  The Court emphasized that "our holding that Union Lake Dam is 'improved' property would not foreclose the statutory immunity from applying to Union Lake and the balance of the 4[]300-acre preserve."  Id. at 272.  The lake was considered "unimproved" public property for purposes of the Tort Claims Act and its immunities regardless of the man-made nature of the dam which created the lake.

A plaintiff must also demonstrate under N.J.S.A. 59:4-2 that the public entity's conduct was "palpably unreasonable."  Brown v. Brown, 86 N.J. 565, 575 (1981); see also Muhammad v. N.J. Transit, 176 N.J. 185, 195 (2003).  Plaintiff cites to Fuller v. California, 51 Cal. App. 3d 926 (1975)[4] for the proposition that Tort Claims Act immunity may be abrogated where human activity performed on unimproved public property transforms it to "improved" public property.  In Fuller, the plaintiff dove into the ocean and hit a sandbar with his head.

---

[4]  In Nieves v. Off. of the Pub. Def., our Supreme Court noted that our State's Tort Claims Act was "modelled" after the California Tort Claims Act and "to which we have turned for insight from time to time . . . ."  241 N.J. 567, 578 n. 2 (2020).

A-1832-18T1

The plaintiff argued that the sandbar constituted "improved" property because the United States Army Corps of Engineers constructed a jetty and yacht harbor 3000 feet from the location of the incident and because "rip rock work" was completed on the San Lorenzo River upstream years beforehand. Id. at 936. Those human-made conditions indirectly caused sand to build upon near the location of the event, according to the plaintiff, resulting in the creation of shallow water. Ibid.

The California court rejected that argument because it would be construed to mean that any "condition affected in anyway by human activity is not a 'natural condition.'" Id. at 938. As the California court and motion judge here correctly recognized, the effects of human activity can be seen throughout the California coast and waterways, but that does not automatically transform them into "improved" public property such that a public entity's immunity would be lost. Ibid.

As the motion judge duly noted, while nearby properties, such as the "unifying seawall," were improved properties, the subject beach and submerged tidelands were unimproved properties. The judge further explained, "the beach and the tidelands remain in their natural state affected by natural conditions including but not limited to the tides, migration of sand, currents, storms,

including Superstorm Sandy, and the winds, to name a few." Moreover, the Hereford Inlet did not "undergo any substantial physical modification" from its natural state, and the judge properly dispelled Dr. Pilkey's opinion that "human-made structures hold the [I]nlet steady." The judge was correct in his analysis.

To the extent decedent's drowning might have been caused, in part, by the condition of the Inlet bed below the water itself, N.J.S.A. 59:4-9 independently insulates defendants here from liability for such a dangerous condition within the definition of "submerged lands." N.J.S.A. 59:4-9 therefore provides an independent basis for immunity that is applicable here.

Additionally, the judge determined plaintiff failed to produce competent evidence regarding the purported "improvement' to the locale of the incident. The judge stated:

> The [c]ourt begins with Troth and focuses on the specific words from that decision. They are, "substantial physical modification." The [c]ourt looks at the specific submerged lands locations where [decedent] and Brandy Smith were at the time of the event as identified by Mr. Sunderland. As in Troth, the [c]ourt finds that they're improved properties such as the nearby properties identified as the seawall. The unifying seawall. And the [c]ourt finds that . . . there are unimproved properties too, such as the subject beach and the adjacent submerged tidelands. The [c]ourt finds that the subject location's natural state was always the coastal part of Hereford Inlet that was adjacent to the subject beach at the north-end of North

15

Wildwood. There was a man-made structure, specifically the seawall, within 400 to 600 feet of the location, that existed for a number of years. However, the [c]ourt finds that the beach and the tidelands remain in their natural state affected by the natural conditions, including but not limited to the tides, migration of sand, currents, storms, including Superstorm Sandy, and the winds, to name a few.

Even accepting Dr. Pilke[y]'s opinion that man-made structures stabilize or hold the inlet in place, the [c]ourt finds, notwithstanding the subject inlet did not undergo any substantial physical modification. The specific inlet location was or remains a beach with adjacent tidelands in Hereford Inlet. The slope, if there was one, this [c]ourt finds was not built by human hands. The gully, if there was one, was not dug by human hands. So, this [c]ourt finds that there was no substantial physical change of the property from its natural state.

The [c]ourt finds that there would always be boundaries to the inlet with a slope of some degree and the beach may be smaller or larger.
. . . .

[T]he [c]ourt finds . . . there is no credible evidence that an unstable slope even existed at the time and place of the incipient event. And even if the alleged unstable slope did exist at the time and place of the event, there's no credible evidence to say any such slope was created by anything other than the natural forces of the waves, the current and the tides.

Lastly, even if the alleged unstable slope existed at the time and place of this incipient event, and even if there's an assumption and it's accepted that [t]he seawall contributed to the creation of the slope, there's no slope data this [c]ourt finds pre- and post- construction of the

sea wall, and there's nothing to establish that the degree substantial, physical modification . . . of which any contribution resulted in a substantial, physical modification of the property from its natural state . . . which a physical change created a hazard did not previously exist.

The judge's rationale was based on substantial credible evidence in the record. Consequently, plaintiff failed to show a jury question concerning whether the action or inaction of defendants was palpably unreasonable and whether the long-standing immunities under the Tort Claims Act apply. Therefore, summary judgment was appropriately granted to defendants.

The judge also barred the proposed opinions of plaintiff's liability experts as net opinions in granting summary judgment to defendants. Before addressing the Tort Claims Act statutes, the judge first made evidentiary findings concerning the lack of a factual basis for the experts' proposed opinions.

The judge's two-step analysis is the correct methodology. See Townsend v. Pierre, 221 N.J. 36, 53 (2015) ("When . . . a trial court is 'confronted with an evidence determination precedent to ruling on a summary judgment motion,' it 'squarely must address the evidence decision first.'") (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 384-85 (2010)). "Appellate review of the trial court's decisions proceeds in the same sequence, with the

17

evidentiary issue resolved first, followed by the summary judgment determination of the trial court." Ibid. (citing Hanges, 202 N.J. at 385).

A determination on the admissibility of expert testimony is committed to the sound discretion of the trial court. Id. at 52 (citing State v. Berry, 140 N.J. 280, 293 (1995)). A trial court's grant or denial of a motion to preclude expert testimony is entitled to deference on appellate review. Ibid. The Supreme Court has instructed: "[W]e apply [a] deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." Id. at 53 (second alternation in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011)). Two rules of evidence frame the analysis for determining the admissibility of expert testimony. See N.J.R.E. 702; N.J.R.E. 703. N.J.R.E. 702 identifies when expert testimony is permissible and requires the experts to be qualified in their respective fields.

N.J.R.E. 703 addresses the foundation for expert testimony. Expert opinions must "be grounded in facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Townsend, 221 N.J. at 53 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "The net opinion

A-1832-18T1

rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration in original) (quoting Polzo I, 196 N.J. at 583).

Therefore, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). The net opinion rule directs "that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). In short, the net opinion rule is "a prohibition against speculative testimony." Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

Applying those principles, the judge correctly found that Dr. Pilkey's opinions were "speculative" regarding the subject location and that "he failed to present any data . . . or scientifically reliable method that any alleged underwater steep slope on July 27, 2012 was caused by the creation of any activity of man." The judge further noted:

Dr. Pilke[y] only generally explains how structures, such as the nearby seawall, could possibly cause an unstable steep slope to develop—an unnaturally steep slope to develop. Plaintiffs have no evidence, data, or scientifically reliable method in this [c]ourt's view to support a conclusion that the seawall in North Wildwood, did to any degree, contribute to anything that caused or created an unnaturally steep slope at the time and location.

There's no data in this record that describes the exact location of the Hereford Inlet on July 27, 2012 before and after the construction of the seawall. There is no data a slope on July 27, 2012 was steeper than the conditions at similar inlet beaches with or without any improvements.

Several assumptions in Dr. Pilkey's proposed opinions have no factual support in the record. The "unstable steep slope" identified by Dr. Pilkey was based upon data from December 2012 after Superstorm Sandy caused massive damage to the New Jersey coastline. Moreover, Dr. Pilkey's analysis was flawed because he addressed an area further into the inlet than where the incident occurred. In short, we agree with the motion judge that Dr. Pilkey's opinions are speculative. We therefore discern no abuse of discretion in precluding Dr. Pilkey from offering expert testimony.

For these reasons, defendants are immunized from liability in this case. And, it is not our function to second-guess the clear legislative mandate within

20

the terms of the Tort Claims Act.  See Posey v. Bordentown Sewerage Auth., 171 N.J. 172, 181-83 (2002).

In light of our decision on the issue of liability under the Tort Claims Act, we need not address plaintiff's argument that Brandy satisfied the threshold requirements of N.J.S.A. 59:9-2(d) to recover pain and suffering damages set forth in Point IV(c) of her brief.  We conclude that the remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant any further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1832-18T1