**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1645-19

I'ASIA MORELAND, individually
and as the Administratrix of the
estate of I'MAYA MORELAND,
I'ASIA MORELAND, Guardian Ad
Litem on behalf of I'ZHIR
MORELAND, and VALARIE
BENNING,

     Plaintiffs-Appellants,

v.

Estate of WILLIAM PARKS,
RONALD HUBSCHER, JR.,
ALBERT DINATALE, BENITO
BELLO, CITY OF TRENTON,
SOVEREIGN BANK ARENA,
n/k/a SUN BANK ARENA, and
GLOBAL SPECTRUM,

     Defendants,

and

COUNTY OF MERCER, MERCER
COUNTY IMPROVEMENT
AUTHORITY, and STATE OF
NEW JERSEY,

Defendants-Respondents.

_____

Argued June 3, 2021 – Decided December 28, 2021

Before Judges Ostrer, Accurso, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0227-11.

Robin Kay Lord argued the cause for appellants (Robin Kay Lord, attorney; Robin Kay Lord and Clifford Bidlingmaier, on the brief).

Paul R. Adezio, Mercer County Counsel, argued the cause for respondent County of Mercer.

Melissa J. Brown argued the cause for respondent Mercer County Improvement Authority (Marks, O'Neill, O'Brien, Doherty & Kelly, PC, attorneys; Melissa J. Brown, on the brief).

Justine M. Longa, Deputy Attorney General, argued the cause for respondent State of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Jessica A. Sampoli, Deputy Attorney General, on the brief).

PER CURIAM

This is the second time we've considered claims arising out of the tragic death of two-year-old I'Maya Moreland crossing Route 129 holding hands with her family on their way to see Disney on Ice at the Sovereign Bank Arena in Trenton in January 2009. Three years ago, we reversed on interlocutory appeal

2

a summary judgment dismissing a <u>Portee</u>[1] claim brought by plaintiff Valarie Benning, I'Maya's mother's then-partner and now wife, holding Benning presented sufficient evidence from which a jury could find Benning was a de facto mother to I'Maya "and felt her loss as deeply as any parent facing that horrific event." <u>Moreland v. Parks</u>, 456 N.J. Super. 71, 86 (App. Div. 2018). Now plaintiff I'Asia Moreland, I'Maya's mother, individually, as the administratrix of I'Maya's estate, and as guardian ad litem of I'Maya's brother I'Zhir Moreland, and Benning appeal from a final summary judgment dismissing their tort claims against the County of Mercer, the Mercer County Improvement Authority (MCIA) and the State of New Jersey. Because we agree with the trial court the Tort Claims Act, N.J.S.A. 59:1-1 to 13-10, shields these governmental entities from liability for this accident, we affirm.[2]

---

[1] <u>Portee v. Jaffee</u>, 84 N.J. 88 (1980).

[2] Plaintiffs also appeal from summary judgment on counts fourteen (Civil Rights) and fifteen (<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978)), alleging defendants violated their constitutional rights to equal protection and substantive due process by the condition of the roadway, their failures to provide adequate training and safety devices, and to have adequate policies and procedures for responding to emergencies and should thus be liable under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c). In their appellate brief, plaintiffs characterize these counts as "constitutional claims advancing theories of State Created Danger and Supervisory Liability <u>against the municipal defendants</u>" (emphasis added). Plaintiffs' settlement with the municipal

There is no dispute about how this horrible accident happened. Moreland and Benning were taking I'Maya, her five-year-old brother I'Zhir, along with Benning's godson Armanti Martinez, also five years old, to see Disney on Ice. The show started at 7 p.m., and they arrived a few minutes late, parking in the free lot for the River Line. The family walked down Hamilton Avenue to cross over to the Arena at State Route 129, a four-lane, north/south highway, having two lanes running in each direction, separated by a median. Holding hands, they crossed the northbound lanes, stopping on the median to let an approaching fire truck pass.

The fire truck — which most observers said had its siren on and lights flashing — did not pass. It was headed south on Route 129 in the left lane,

---

defendants bars any claims against those defendants in this court. Kelleher v. Lozzi, 7 N.J. 17, 26 (1951). To the extent counts fourteen and fifteen sound against respondents, plaintiffs advance no argument explaining how the County, the MCIA or the State deprived them of their substantive constitutional rights by the derelictions they allege, contending only that the trial court erred in dismissing those counts by failing to adequately address the merits of their claims under Rule 1:7-4(a). "Parties are required to make an adequate legal argument" in support of the issues they raise. 700 Highway 33 LLC v. Pollio, 421 N.J. Super. 231, 238 (App. Div. 2011). Because plaintiffs have not argued how their constitutional rights to equal protection or substantive due process were violated, and no cogent theory of liability presents itself to us, we do not consider the issue and deem it waived. See Weiss v. Cedar Park Cemetery, 240 N.J. Super. 86, 102 (App. Div. 1990) (noting the failure to adequately brief an issue permits the court to treat it as waived).

trying to get to an accident to the north on Route One. The driver, Ronald Hubscher, decided the quickest way to the scene was to make an illegal U-turn at Hamilton Avenue. But owing to the size of the rig, Hubscher couldn't get the pumper truck around from the left lane. He thus slowed down and moved over into the right lane to make a sweeping left turn across Hamilton Avenue and into the Route 129 northbound lanes. Driving behind Hubscher in a white pickup truck was William Parks. Parks, sixty-seven years old, whose license had been recently suspended for drunk driving, saw the fire truck slow down and move right, for what he anticipated would be a right turn. Parks was driving past the firetruck on the left — about to pass in front of the Moreland family on the other side of Hamilton Avenue — when the fire truck swung back and veered into him. The heavy fire truck pushed the pickup left and sent it careening across Hamilton Avenue and down the Route 129 median, striking and killing I'Maya and bringing down a light pole.[3]

Plaintiffs' accident reconstruction expert concluded Hubscher's reckless, illegal left turn in front of Parks was the proximate cause of the accident.

---

[3] Benning's godson suffered fractures of both legs when the light pole came down on him. He is not a part of this suit. Although the pickup must have passed within inches, if not centimeters, of the rest of the family, and its force knocked at least Benning to the ground, no one else was struck. All, of course, have suffered unimaginable anguish from this awful tragedy.

Trenton police deemed the cause of the crash to be Parks' failure to keep back 300 feet while following a fire truck responding to an emergency as required by N.J.S.A. 39:4-92(b) and driving while his license was suspended. Neither found anything about the roadway or the intersection contributed to the happening of the accident or attributed any fault to the State, the County, or the MCIA, owner of the Arena. Plaintiffs, who have since settled their claims against the City and both drivers,[4] claim the Hamilton Avenue/Route 129 intersection was in a dangerous condition of which the State, the County and the MCIA were all aware, and that the failure to have constructed the Arena without a pedestrian footbridge over Route 129, or taken other steps to protect them from the known dangerous condition, caused I'Maya's death. All three defendants assert a variety of immunities under Title 59 shield them from liability.

We briefly summarize the material, undisputed facts on the summary judgment motions. Route 129, which, as already noted, is a four-lane divided highway, is owned by the State. It has a speed limit of forty miles per hour. It was last reconstructed in the mid-1990s under the auspices of the Department of

---

[4] Parks, who had no alcohol in his system at the time of the accident, pleaded guilty to causing death while driving with a suspended license and received a probationary sentence. He died in 2017. His estate contributed $225,000 to a settlement with plaintiffs in the gross amount of $2,300,000. The City of Trenton contributed the remaining $2,075,000.

Transportation. A pedestrian footbridge at Hamilton Avenue was not a part of the approved design. Construction was completed in 1995, with the Department's resident engineer certifying the road "as built" had been constructed in conformity with the plans.

Most of Hamilton Avenue is owned by the County. The State, however, owns and maintains that stretch of the road in Trenton from South Broad Street to Route 129. All agree the State is solely responsible for the Hamilton Avenue/Route 129 intersection where the accident occurred. In that regard, the State implemented new traffic signal timing for the intersection in 2007, and there is no record of any change through the date of the accident. The time for pedestrians to cross the roadway was consistent with federal and State standards, as was the width of the crosswalk. The four-foot-wide pedestrian island between the north and south lanes of Route 129 met the minimum width standard.

Plaintiffs' traffic expert opined the intersection was "clearly a significant congestion point during arena events" and "[b]ased on crowd size during events, wider crosswalks may be warranted." He also noted the steps the MCIA took in 1998, before the Arena opened, to design a pedestrian footbridge to cross Route 129 south of the intersection to connect with the then proposed light rail station — now the Hamilton Avenue Station for the River Line where plaintiffs

7

parked the night of the accident. In the expert's view, a footbridge to the south would remove "pedestrian movements from the intersection" and thus "could free up geometry and time from the signal timings to provide intersection operation more suitable for the surge of movements that occur during events." He noted despite the "many recommendations and warnings regarding the potentially unsafe nature of this roadway," the footbridge was never built. He concluded the "failure to act on identified safety concerns that existed on the section of Route 129, in the vicinity of the Arena, and at the intersection of Route 129 and Hamilton Avenue was unreasonable and did not protect the public welfare."

The MCIA began planning the design of the Arena in 1997. During the ensuing two years of development and construction, the MCIA, the City of Trenton, the County and the State all considered traffic and parking issues for the site. Among the issues they discussed was the potential for conflicts between vehicular and pedestrian traffic at the intersection of Route 129 and Hamilton Avenue. The MCIA undertook a traffic study and considered a variety of traffic control measures, including the placement of traffic control officers at the intersection; a special traffic signal timing plan during Arena events; signage to alert motorists of Arena events, the presence of pedestrians, and available

parking lots; the installation of new striping and pedestrian signals in order to channel pedestrians to appropriate crossings; and the installation of rumble strips on the approaches to the traffic signal and pedestrian crossing. The MCIA also hired an engineering firm to design a pedestrian bridge over Route 129, consulting and agreeing with the County on the design.

In January 1998, the City's planning board approved the MCIA's plans for the construction of the Arena subject to the recommendations of its planning staff, including that the MCIA "further explain the plans and scheduling for the Route 129 pedestrian bridge" and that "[f]urther measures to protect pedestrians crossing Hamilton Avenue and Route 129 from satellite parking lots shall be implemented." Mercer County subsequently approved the MCIA's plans for the Arena in May 1998, conditioned on necessary approvals from the Department of Transportation.

The Department of Transportation, however, never approved a pedestrian bridge over Route 129. The Department's Division of Project Management wrote to the County's chief of planning in June 1998 that "[t]here is no precedent for a bridge of this type over a State Highway." The letter also noted the "non-structural tower and cable system appear to be a potential long term maintenance issue as well as an attractive nuisance," and asked "[w]hat agency, other than

the NJDOT, is responsible for maintenance, safety and inspection issues regarding this structure?" The Department advised it would "need written documentation outlining the entity responsible for maintaining the structure." The writer complained "NJ Transit has informed us the MCIA will be responsible for maintaining the structure and the MCIA has told us NJ Transit will maintain it" and that the subject needed "closure." The idea of a pedestrian bridge spanning Route 129 and linking the Hamilton Avenue light rail station with the Arena ultimately died because none of the concerned public entities was willing to bear the cost of maintaining the structure.

After the Arena opened in 1999, concerns about the safety of the intersection persisted. Chief of Enforcement for the MCIA wrote to the manager of the Bureau of Traffic Engineering at the Department of Transportation in April 2000 about traffic exiting Route 1 to Route 129, especially when the Arena was hosting events where pedestrians would be crossing the highway at the Route 129/Hamilton Avenue intersection. The problem was drivers on the exit ramp were unable to see traffic congestion ahead due to a crest on the ramp, creating "a potentially dangerous condition" and prompting the MCIA to ask whether the State could install a warning device to advise motorists of "stopped traffic ahead" and to proceed cautiously.

The State did not install the requested warning sign and continued to reject the idea of a pedestrian bridge over Route 129. By letter to New Jersey Transit in early 2002, the Department of Transportation again reiterated the advice it had previously provided both Transit and the MCIA that the Department was "not going to take any responsibility for the proposed pedestrian bridge at Hamilton Avenue," and "[n]o permits will be issued for this work until the Department has received documentation on the jurisdictional control of the proposed structure."

The Arena has a capacity of over 10,000 persons and the MCIA provides parking, for a fee, near the Arena and in some remote lots. As the owner of the Arena, the MCIA is responsible for parking, traffic safety, and security for Arena events. It contracts with both the Trenton Police Department and the Mercer County Sheriff's Office to provide officers to handle traffic safety and patrol the area during Arena events. For the Disney on Ice show, the MCIA contracted with the Trenton Police Department for officers; no sheriff's officers were present for the event.

The MCIA codes events at the Arena by the number of expected attendees. The Disney on Ice show in January 2009 was considered a "code four" event,

meaning the MCIA expected fewer than 3,000 attendees.[5]  For code four events, the MCIA contracts for five officers and one supervisor for traffic control and event security.

Ordinarily, an officer would not be assigned to the Route 129/Hamilton Avenue intersection for a code four event.  Although some pedestrians might cross Route 129 to attend such an event, fewer people were expected to do so because Lot 5, the remote parking lot operated by the MCIA that would require patrons to cross Route 129, was not open for code four events.  That lot was open only when the MCIA expected more than 8,000 people at the Arena.  On the night of the Disney on Ice show, the remote lot was closed.  Lot 1, the lot located adjacent to the north side of the Arena, across Hamilton Avenue, was open and not full.

Although a code four event did not call for an officer to be stationed at the Route 129/Hamilton Avenue intersection, the supervisor in charge on the night of the accident, Trenton police sergeant Albert Dinatale, assigned Sergeant Benito Bello to control or "run" the light there due to traffic conditions.[6]

---

[5]  Actual attendees exceeded that figure.  Between 3,300 and 3,500 people were estimated to have attended the show that night.

[6]  Plaintiffs sued both Dinatale and Bello in this suit, both of whom were dismissed on summary judgment.  Plaintiffs have not appealed the dismissal of their claims against either officer.

Dinatale stationed himself at the intersection as well, to assist Bello and, if necessary, to help cross pedestrians — although neither Bello nor Dinatale recalled there being any pedestrian traffic that evening. Dinatale explained at his deposition that ninety percent of vehicular traffic for Arena events came through the Route 129/Hamilton Avenue intersection. Accordingly, he believed it necessary for an officer to run the lights at the intersection in order to keep traffic moving and to protect pedestrians even for lightly attended events.

At 6:50 p.m., Dinatale observed little traffic at the intersection, so he directed Bello to stop running the light. Thereafter, the two remained at the intersection until approximately 7:00 p.m., when Dinatale heard music coming from the Arena, indicating to him the show was starting. Dinatale and Bello drove to the main gate, communicating by radio and in person with the other officers about what they were observing at their locations. With no late arrivals observed by any of the officers reporting, Dinatale told the officers they could move to their secondary posts. As Dinatale and Bello neared the entrance to the Arena to report to their own secondary posts, they heard the crash, which occurred at 7:03 p.m., and ran back to the intersection to render aid.

Plaintiffs' expert in public assembly risk management opined the MCIA's coding system was inadequate, and there was insufficient coordination between

A-1645-19

the Arena, officers, and the City, including the fire department. He claimed the "officers could have easily utilized safety techniques to provide a safer environment for those crossing busy roadways." Although noting there was "no specific industry standard" for when redeployment should occur, he claimed to have "never seen or heard of redeployment at the exact start or even before an event started." In his opinion, Dinatale's decision to redeploy officers from the Route 129/Hamilton Avenue intersection, without accounting for late-arriving patrons, "represent[ed] a major flaw in the deployment process as officers should not have left the intersection for at least 15 minutes after the show started."

The expert concluded defendants "knew the intersection was dangerous," and "they needed a police presence to protect patrons," yet "did not properly develop/deploy a plan that met the known need[;] personnel were redeployed at inappropriate times, and the plan was inappropriate from the very beginning." He claimed all of those elements contributed "to an unsafe environment" resulting in I'Maya's death.

After hearing several hours of argument, the judge rendered an opinion from the bench granting these defendants summary judgment. After recapping the facts adduced on the motions and reviewing the parties' claims and defenses,

14

the judge applied the law to the undisputed facts and concluded all of plaintiffs' tort claims against the State, the County, and the MCIA were barred by various provisions of the Tort Claims Act.

Specifically, the court found that to the extent plaintiffs complained about the absence of police to cross them at the Route 129/Hamilton Avenue intersection, their claims were barred by police protection immunity under N.J.S.A. 59:5-4. Acknowledging that plaintiffs insisted they were "not alleging failure to provide police protection," the judge found "it seems clear that they are" alleging precisely that, noting plaintiffs' reliance on the report of their public assembly risk management expert, who "criticized the deployment of the officers and safety techniques the officers failed to utilize." The judge found plaintiffs' claims analogous to the ones asserted by the plaintiffs in Rodriguez v. New Jersey Sports & Exposition Authority 193 N.J. Super. 39 (App. Div. 1983), that we found barred by N.J.S.A. 59:5-4.

The judge also rejected plaintiffs' argument "that even if the cause of action was interpreted as a failure to provide police protection, immunity under 59:5-4 would not apply" because "defendants here left the plaintiff stranded on the highway," finding it undisputed that Dinatale and Bello departed the intersection "before the family came along." The judge concluded "[t]he . . .

15

MCIA, contracted with the . . . Trenton Police Department to provide security services [at the Arena], although plaintiffs argue otherwise. They are essentially arguing enough police protection was not provided and, as such, there is absolute immunity under 59:5-4." Alternatively, the judge found the MCIA had discretionary immunity with respect to its allocation of security personnel under N.J.S.A. 59:2-3(d), and nothing in the record, including plaintiffs' public assembly risk management expert's report, supported a conclusion that the MCIA's exercise of discretion was palpably unreasonable.

The judge likewise found plaintiffs' claims premised on the failure to provide warning signs was barred by the traffic signal immunity provided under N.J.S.A. 59:4-5. The judge rejected their claims that 59:4-4, the section of the Act making public entities liable for injuries proximately caused by the "failure to provide emergency signals, signs, markings or other devices" if necessary to warn of a dangerous condition endangering the safe movement of traffic and not reasonably apparent to, or anticipated by, a person exercising due care, was applicable here. The judge found "an intersection with a pedestrian crossing" did not constitute an emergency that would displace the immunity to which public entities were entitled "for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices" under 59:4-5.

The judge further found plaintiffs' claims premised on the failure to construct a pedestrian bridge over Route 129 were barred by plan or design immunity under N.J.S.A. 59:4-6, as it was undisputed the State constructed Route 129 according to the plans, which plainly did not include a pedestrian bridge. The judge also found plan or design immunity with respect to construction of the Arena. The judge found it irrelevant that the City's planning board had approved plans to construct the Arena that included a pedestrian bridge because it was undisputed the Department of Transportation would have to approve any such bridge, and the Department never issued any approval.

The judge also found defendants entitled to discretionary immunity under N.J.S.A. 59:2-3 with respect to the failure to construct a pedestrian bridge, rejecting plaintiffs' claim the immunity did not apply because the decision not to build the bridge was "operational and not policy-based and, as such defendants must show the decision was made in the face of competing demands and its determination was not palpably unreasonable." The judge found the public entity defendants' decisions to decline to assume responsibility for maintenance of the proposed pedestrian bridge are precisely the sort of discretionary decisions immunized under 59:2-3, and the State's refusal to issue

A-1645-19

a permit for its construction obviated the need for any showing under the palpably unreasonable standard.

Finally, the court rejected plaintiffs' contention that defendants could be held liable under N.J.S.A. 59:4-2 for injuries caused by a dangerous condition of public property. The judge found the Route 129/Hamilton Avenue intersection merely a busy intersection in an urban environment, with the mixing of pedestrians and vehicular traffic inherently dangerous. The judge found the absence of a pedestrian bridge over Route 129 did not make the intersection defective, or a dangerous condition, nor was it palpably unreasonable for the State to have determined not to build a bridge over the highway.

Plaintiffs' appeal, reprising the arguments they made to the trial court that there exists a genuine issue of material fact as to whether the Route 129/Hamilton Avenue intersection was a dangerous condition of which defendants' failure to protect them was palpably unreasonable, contending the trial court erred in applying plan and design immunity, discretionary immunity under N.J.S.A. 59:2-3, and police protection immunity. They add the court improperly dismissed Benning's non-Portee negligent infliction of emotional distress claim and that the trial judge "decided this very complex case without reading all the moving papers in violation of Rule 1:6-7" and misapplied the

summary judgment standard.  We reject all of these arguments as without merit.  None of them requires any extended discussion in a written opinion.  See R. 2:11-3(e)(1)(E).

We begin by addressing plaintiffs' last two arguments first.  Rule 1:6-7 requires trial judges "[i]nsofar as possible" to "read moving papers and briefs in advance of the hearing" with the obvious intent "to ensure that trial judges be familiar with the moving papers in advance of motion arguments," Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 1:6-7 (2022).  After taking the appearances of the nine lawyers who argued these motions in advance of over four hours of oral argument, the judge advised the lawyers he'd read "the briefs and the attachments where [he] thought [he] needed to read something."  But he also advised counsel he had "not read every word of every page" of the extensive materials submitted on the motion, and thus invited them to "please feel free" to point out anything they thought it especially important he consider among those materials, representing he would "make sure if [he hadn't] considered it" that he did so before ruling.

Plaintiffs claim the judge's "failure to read all the briefs and all the cases cited therein . . . led to inaccurate findings of fact and law."  Leaving aside the judge made clear he had read all the briefs and made no comment one way or

the other about having reviewed the cases "cited therein," our own review of this extensive record and the trial court's thorough and well-reasoned opinion leave us without any doubt that the judge was in full command of both the critical facts and the controlling law.  Indeed, we affirm substantially for the reasons expressed in the oral opinion the judge delivered from the bench within an hour after argument.  We accordingly reject plaintiffs' claim that the judge's invitation to counsel to identify anything in particular in the supporting papers they wanted to ensure he'd studied before he rendered a decision on the motions constituted a violation of Rule 1:6-7.

Because we apply the same standard in reviewing a summary judgment as the trial judge did in deciding it and review questions of law de novo without deference to any interpretive conclusions we believe mistaken, Nicholas v. Mynster, 213 N.J. 463, 478 (2013); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we have no need to consider plaintiffs' argument that the judge misapplied the summary judgment standard.  Instead, viewing the facts in a light most favorable to plaintiffs, we consider whether the evidence presented a sufficient disagreement to require their submission to a jury or whether it was "so one-sided that one party must prevail as a matter of law."  Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-

46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)).

As our Supreme Court regularly reminds in Title 59 matters, "[t]he Act's 'guiding principle' is 'that immunity from tort liability is the general rule and liability is the exception.'" O'Donnell v. N.J. Tpk. Auth., 236 N.J. 335, 345 (2019) (quoting Coyne v. State, 182 N.J. 481, 488 (2005)). We agree with the trial court that plaintiffs advanced no theory that would permit them to pierce the immunities of these defendants. We address the claims against each.

In order to impose liability on a public entity for the dangerous condition of its property pursuant to N.J.S.A. 59:4-2, a plaintiff must establish there existed a "dangerous condition," that the condition proximately caused her injury, "that it 'created a reasonably foreseeable risk of the kind of injury which was incurred,' that either the dangerous condition was caused by a negligent employee or the entity knew about the condition, and that the entity's conduct was 'palpably unreasonable.'" Vincitore v. N.J. Sports & Exposition Auth., 169 N.J. 119, 125 (2001) (quoting N.J.S.A. 59:4-2).

N.J.S.A. 59:4-1(a) defines a dangerous condition as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

As the trial court correctly noted, in deciding whether a dangerous condition exists, the focus is necessarily on the condition of the property itself. See Daniel v. State, Dep't of Transp., 239 N.J. Super. 563, 586 (App. Div. 1990). The law is well-settled that "[i]f a public entity's property is dangerous only when used without due care, the property is not in a 'dangerous condition.'" Garrison v. Twp. of Middletown, 154 N.J. 282, 287 (1998).

Here, it is plain that plaintiffs' claim of a dangerous condition founders on the first two prongs of 59:4-2, dangerous condition and proximate cause. It is undisputed the accident was as a result of the lack of due care exercised by defendants Hubscher and Parks, that is Hubscher's illegal left turn and Parks' failure to maintain a safe distance from, or yield to, an emergency vehicle. Nothing about the physical condition of the roadway or the intersection contributed in any fashion to this accident. See Daniel, 239 N.J. Super. at 585-90 (explaining how a highway median could be "considered a dangerous condition where it fails to fulfill its essential purpose and substantially exacerbates the perils of everyday driving" by enhancing the risk that cars inadvertently making contact with it "would be vaulted or catapulted into lanes of oncoming traffic").

A-1645-19

As we have elsewhere observed, there is an obvious risk posed to pedestrians by vehicular traffic, and "[i]n the absence of due care, traffic congestion may enhance the risk of injury so that the risk becomes substantial." King v. Brown, 221 N.J. Super. 270, 275 (App. Div. 1987). "But the test is whether the condition complained of creates a substantial risk of injury despite the exercise of due care by motorists and pedestrians." Id. at 275-76. Here, there is simply no evidence in the record the Route 129/Hamilton Avenue intersection was dangerous or unsafe when used with due care.

Plaintiffs' argument that the accident would never have occurred had the State approved or erected a pedestrian bridge or installed additional signage is answered by the Legislature's declaration in 59:1-2 that "the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done." Moreover, the Act accords the State absolute immunity for the absence of a pedestrian bridge and design of the roadway under N.J.S.A. 59:4-6,[7] because

---

[7] N.J.S.A. 59:4-6 provides:

> Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such

it is undisputed that Route 129 was constructed in the mid-1990s in accordance with the approved design that did not include a pedestrian bridge. Thus, the absence of a pedestrian bridge, and the roadway design in general, cannot form the basis of liability. Levin v. County of Salem, 133 N.J. 35, 45 (1993).

Because plan or design immunity is perpetual, "the immunity is not lost even if new knowledge demonstrates the dangerousness of the design, or the design presents a dangerous condition in light of a new context." Manna v. State, 129 N.J. 341, 355 (1992). Accordingly, the State is not only immune for constructing Route 129 without a footbridge in the mid-1990s but also for its later refusal to approve one in connection with construction of the Arena in the late-1990s and thereafter.

The State's decision not to construct or approve construction of the footbridge is also immunized by N.J.S.A. 59:2-3(c), which provides: "A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the

> plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.

<u>construction or maintenance of facilities</u>, the hiring of personnel and, in general, the provision of adequate governmental services" (emphasis added) and by N.J.S.A. 59:2-5, an immunity not referenced by the trial court but asserted by the State in its answer, which states: "A public entity is not liable for an injury caused by the . . . denial . . . of, or by the failure or refusal to issue . . . any . . . approval . . . where the public entity or public employee is authorized by law to determine whether or not such authorization should be issued, denied, suspended or revoked." As to these discretionary and permit immunities, the record is clear the Department of Transportation declined to construct a pedestrian bridge over Route 129 and refused to authorize construction of one by the MCIA or New Jersey Transit based on the unresolved issue of what entity would assume responsibility for its continued maintenance. Under Title 59, no liability can attach to those decisions.

To the extent plaintiffs assert the State should be liable for the absence of appropriate traffic signals or signs along Route 129, Title 59 provides immunity under N.J.S.A. 59:4-5, which states: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices." <u>See</u> <u>Weiss v. N.J. Transit</u>, 128 N.J. 376, 385 (1992) (holding "[w]hen the absence of

a traffic signal or the design of the crossing is the true culprit, government is immune").  We agree with the trial judge that the State is not liable under N.J.S.A. 59:4-4 for its failure to provide "emergency" devices necessary to warn of a dangerous condition harmful to the safe movement of traffic that would not be apparent to one using due care.  As in Weiss, the danger here "was endemic, not emergent," making the exception provided in 59:4-4 inapplicable. See id. at 383-84.

We agree with the trial court that plaintiffs' claims against the County to ensure their safe passage across Route 129 fail because it is undisputed the State owned both Route 129 and the stretch of Hamilton Avenue at issue and controlled the Route 129/Hamilton Avenue intersection, leaving the County with no ownership or control over either road or the intersection, a necessary prerequisite to liability.  See Posey v. Bordentown Sewerage Auth., 171 N.J. 172, 182-84 (2002); Weiser v. County of Ocean, 326 N.J. Super. 194, 199-200 (App. Div. 1999).

As to the MCIA, we agree with plaintiffs that the MCIA as a landowner has a duty under established law to undertake reasonable safeguards to protect patrons "from the dangers posed by crossing an adjoining highway" to an area it knew or should know patrons will use for parking.  See Mulraney v. Auletto's

Catering, Nat. Valet Parking Servs., 293 N.J. Super. 315, 321 (App. Div. 1996). While the MCIA notes it provided patrons parking in a lot directly adjacent to the Arena that would not require them to cross Route 129, we note it apparently charged a fee separate from the ticket price to park in that lot. We need not consider whether the MCIA's duty to undertake reasonable safeguards extended to the River Line light rail lot, where MCIA patrons could park free, because we agree with the trial court the MCIA enjoys discretionary and police protection immunity for its decisions as to those safeguards under its control and "[w]hen both liability and immunity appear to exist, the latter trumps the former." Tice v. Cramer, 133 N.J. 347, 356 (1993).

Specifically, plaintiffs suggest the MCIA could have discharged its obligation to provide safe passage "in any number of ways, including portable warning signs, a pedestrian footbridge, private security, shuttle trams, or helicopter rides, for that matter." As to the pedestrian footbridge, we agree with the trial court the City planning board's approval of Arena construction plans that included a bridge is of no assistance to them in establishing liability. It is undisputed that construction of a pedestrian bridge over Route 129 required approval by the Department of Transportation, which never issued an approval. Absent Department of Transportation approval, the MCIA had no authority to

construct a pedestrian bridge over the State Highway. Accordingly, the MCIA's conduct in not constructing one cannot be deemed palpably unreasonable. See Kolitch v. Lindedahl, 100 N.J. 485, 493 (1985).

We also agree with the trial court that the evidence on the motion reflects the MCIA had an established plan for addressing traffic and pedestrian safety in connection with events at the Arena, which included contracting with the City to provide police protection. The MCIA's decision to utilize public safety officers rather than the other methods proposed by plaintiffs constitutes a discretionary decision, immunized from liability under N.J.S.A. 59:2-3(c). Moreover, the alleged inadequacy of the MCIA's policing plan is immunized by the police protection immunity under N.J.S.A. 59:5-4, which states: "Neither a public entity nor a public employee is liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." See Sczyrek v. County of Essex, 324 N.J. Super. 235, 239-42 (App. Div. 1999); Rodriguez, 193 N.J. Super. at 43.

Plaintiffs claim the MCIA's duties to them were enhanced by its awareness of the dangerous condition of the intersection fails because they cannot establish the intersection was a dangerous condition under N.J.S.A. 59:4-1. Because plaintiffs can recover against the State, the County, and the MCIA only as

28

permitted under the Tort Claims Act, and as they cannot establish liability under the Act as a matter of law on this record, Benning's negligent infliction of emotional distress claim was also properly dismissed on summary judgment.

In sum, this was a tragic accident caused by a firetruck making an illegal left turn at the Route 129/Hamilton Avenue intersection colliding with a pickup truck that failed to keep back or yield as plaintiffs' family stood alone on the Route 129 median. Although plaintiffs' traffic safety expert and their expert in public assembly risk management found much to criticize in the manner the MCIA managed events at the Arena and both identified a number of procedures that could have improved pedestrian safety during the crush of those events, traffic was quiet and there were no other attendees in the vicinity at the time of the accident. None of the items plaintiffs' experts identified proximately caused or even significantly contributed to I'Maya's tragic and needless death; the intersection was not a dangerous condition as defined in 59:4-1, and these defendants had statutory immunities for the steps they took and didn't take here, none of which were palpably unreasonable. Plaintiffs' remaining arguments, to the extent we have not addressed them, are without sufficient merit to warrant further discussion. See R. 2:11-3(e)(1)(E). We affirm summary judgment to

defendants dismissing plaintiffs' complaint essentially for the reasons expressed

by Judge Anklowitz in his opinion from the bench on November 9, 2016.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1645-19